**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-183 (TSC)** |
| **v.** | : | |
| | : | |
| **LYNNWOOD NESTER,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Lynnwood Nester to 12 months' incarceration, restitution in the amount of $500, and a fine.

## I.    Introduction

Defendant Lynnwood Nester, a 57-year-old employee of an archery store in Pennsylvania, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

1

Nester was convicted at trial of violations of 18 U.S.C. § 1752(a)(1) (Entering and remaining in a restricted building or grounds), 18 U.S.C. § 1752(a)(2) (Disorderly and disruptive conduct in a restricted building or grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly conduct in a Capitol Building), and 40 U.S.C. § 5104(e)(2)(G) (Parading, demonstrating, or picketing in a Capitol Building). The government's recommendation is supported by Nester's: (1) storming of the Capitol as part of a violent mob that overran police defenses at three locations; (2) surrounding police officers guarding the Rotunda Door and refusing to leave as other rioters assaulted the police and forced open the door; (3) entering the building and acting disorderly inside the Capitol, in one instance joining a group chant of "Whose house? Our house!"; (4) falsely testifying at trial that he believed he had a right to enter the Capitol and that the police allowed him to come in.

The Court must also consider that Nester's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Nester's crime support a sentence of 12 months' incarceration, restitution in the amount of $500, and a fine.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Complaint Affidavit (ECF 1).

### Defendant Nester's Role in the January 6, 2021 Attack on the Capitol

Nester prepared in advance for violence on January 6. In the days leading up to January 6, Nester researched the laws on bringing firearms to D.C. and purchased multiple other weapons.

On January 4, Nester informed a group of individuals with whom he was planning to travel to D.C. that he was researching D.C. gun laws and consulting an attorney about bringing firearms to D.C. Nester provided the group with information about possible jail sentences. He determined that it would be a felony to be caught with a gun, and that ultimately it was not worth the risk. Nester told the group: "If I had a reasonable expectation my life would be in danger, I would absolutely risk it" (punctuation omitted). Other members of his group responded, "It's not worth getting a felony" and "It's a hard choice." One member of his group, Sandra Weyer, said "I'm taking my weapons . . . My plan is to take out as many Liberals, Antifa, and BLM from a 'high' vantage point . . . as many as I can in the first hour. I will then blast my way into to the Capitol and take out several Dems and RINOS."

There is no evidence that Nester brought firearms to the Capitol. Instead, Nester purchased other weapons. In a message to Weyer on January 4, Nester said that he had purchased "another taser, 2 pepper sprays, and a 3-inch knife." On January 6, photos and video at the Capitol show Nester holding a wooden cane and wearing two shoulder bags, which could have concealed one or more other weapons.



*Figure 1: Nester (circled in yellow) with other members of his group within the restricted area at the top of the Rotunda steps.*

On January 4, Nester also communicated with an acquaintance, Jeremy Ressler, about the trip to D.C. that he was organizing. Nester told Ressler that he was going with a group of "10 or so" in a van and that there were still two seats available. Nester informed Ressler that his group was "fairly hardcore" and stated that they would "be looking to get involved if scuffles break out."

On the morning of January 6, 2021, Nester and eight other individuals drove from Pennsylvania to Washington D.C.[2] Nester drove the van with Sandra Weyer beside him.



*Figure 2: Nester (yellow circle) driving the van to Washington D.C. from Pennsylvania on the morning of January 6. Sandra Weyer (in red sweatshirt) is seated next to Nester.*

After attending the "Stop the Steal" rally, Nester and the other group members walked to the east side of the Capitol. There, the U.S. Capitol Police had established a manned barrier with

---

[2] At trial, two of the occupants of the vehicle that Nester drove to and from Washington, D.C. were specifically identified: Pauline Bauer and Sandra Weyer. Ms. Bauer was convicted at trial of Obstruction of Congress, in violation of 18 U.S.C. § 1512(c)(2) and associated misdemeanors and sentenced to 27 months incarceration. *See* 21-cr-386. Ms. Weyer was also convicted at trial of Obstruction of Congress and associated misdemeanors and sentenced to 14 months incarceration. *See* 22-cr-40. In addition, William Blauser, 21-cr-386 and Michael Pomeroy, 22-cr-183, also traveled to and from Washington D.C. with Nester, each of whom pled guilty to Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). Finally, Nester's co-defendant Brian Korte also pled guilty to 40 U.S.C. § 5104(e)(2)(G).

metal bike racks across the East Front Plaza. Nester joined the unruly mob that overran police lines in three successive locations.

First, Nester saw that the exterior perimeter was protected by metal barricades, and the police were trying to hold the mob back. As Nester watched and moved closer to the police, other rioters ripped the barricades out of the hands of the police and pushed past the officers. Seconds later, at approximately 1:59 p.m., Nester joined the mob in surging through the line into the restricted area on the East Front Plaza.



*Figure 3: Nester (yellow circle) watches as other rioters rip the barricades out of the hands of the police, moments before moving into the restricted area.*

 

*Figure 4: Other rioters removing police barricades in front of Nester.*

After the mob broke through the first line, the police fell back and attempted to regroup halfway up the East steps to the Capitol, while the mob, including Nester, advanced toward them. For several minutes, the police prevented the mob from advancing up the stairs.

Over the course of the next two hours, Nester moved with Sandra Weyer, who recorded extensive video that was presented at trial. At the second police line, Weyer stood next to Nester and announced they were "storming the Capitol, we broke down the barriers!" As Nester, Weyer, and the rest of the mob then advanced up the Rotunda stairs, Weyer shouted about the police, "They're macing! They're macing!" and "hold your ground!" At the top of the Rotunda stairs, Weyer yelled, "holy fucking shit, we're at the top of the Capitol steps after breaking through the barricades. This is what patriotism looks like!" Nester was at Weyer's side the whole time.[3] After breaking through the second police line, Nester pushed forward through the mob to the Rotunda Door. The mob chanted "Let us in!" As Nester watched, other rioters violently assaulted the police

---

[3] As discussed below, Nester testified at trial he believed that Pennsylvania congressman Dough Mastriano was giving a speech at this location. However, Weyer's running commentary at the time, captured and preserved on video, does not support this claim.

officers defending the door. Rioters sprayed police with tear gas, hit them with flag poles and other objects, pelted them with projectiles, and ripped the riot shields out of their hands. At trial, Nester admitted that he saw attacks against the police.[4]



*Figure 5: USCP officers guarding the Rotunda door being sprayed and assaulted by rioters in front of Nester.*

When the Rotunda Door was forced open by rioters already inside the building, the mob outside overran the police and entered the Capitol. Nester, Weyer and co-defendant Brian Korte, paused only to allow a column Oath Keepers militia members dressed in camouflage clothing, helmets, and military gear to pass in front of them. They then followed the Oath Keepers inside. In video recorded by Weyer, a blaring alarm and chants of "Our House!" can be heard as Nester entered the Capitol.

---

[4] Nester testified that he was "close enough to see those police physically exhausted trying to keep the crowd back with every means they had" and that he saw "violence against the police" and people "attempting to strike the police" at the Rotunda Door. Trial Transcript at 74-77.



*Figure 6: USCP surveillance video of Nester (yellow circle) just after entering the Capitol. Weyer can be seen in front of Nester, recording video.*

Nester and his two associates remained inside the Capitol building for approximately 10 minutes. During that time, they roamed through the Rotunda, went upstairs to the third floor, walked through several hallways, and returned to the Foyer on the inside of the Rotunda Door. In the Foyer, Nester saw other rioters exiting the building, but did not leave. When other rioters shouted, "Who's House?" Nester raised his cane into the air and shouted, "Our House!"



*Figure 7: Nester (yellow circle) joining in a chant of "Whose house? Our house!"*

After exiting the building, Nester and his associates stood on the terrace outside the Rotunda Door for approximately one and one half more hours. Shortly after exiting the building, he sent a text message to a friend bragging that "We stormed the Capitol…"

On the terrace, Nester watched as other rioters continued to try to get inside. At 3:18, he sent another message, "We are outside, we can't get back in."  Other rioters discussed the fact that someone had been shot inside the Capitol, and some chanted "Hang Mike Pence!" and "Shame on Pence!" At 4:03 p.m.—approximately two hours after he first entered the restricted area—Nester sent a text announcing that "We're all still here at the Capitol door."

During this time, Congress could not resume its work certifying the results of the 2020 presidential election because of rioters, like Nester, who remained inside the restricted area.

The next day, on January 7, Nester communicated by Facebook messenger with Ester Doll, an acquaintance who had also been at the Capitol on January 6.  Doll informed Nester that she had heard that "some girl got shot" inside the Capitol, an apparent reference to Ashley Babbit. In response, Nester told Doll "Everyone [in] our group was prepared to go down, I'm sorry someone got hurt but also sure those who did have no regret." Nester testified at trial that by "go down" he meant he was "ready to die for [his] cause."

On January 11, Nester continued his conversation with Doll. Doll suggested that the police had intentionally let some rioters into the building, but Nester strongly disagreed. Nester told Doll he had been "close enough to the front to know that [the police] fought to hold the crowd back from the doors until they were physically exhausted with every means they had." He continued: "The police were badly outnumbered and overpowered" and "they relented when they were defeated." Nester further said to Doll: "The only thing that confuses me is why they did not use

live fire, as I would have thought and in fact did expect that to prevent actual entry. Obviously, they were instructed not to create a mountain of dead bodies…"

*Nester's Testimony at Trial*

At trial, Nester testified that he went into the restricted area at the Capitol and joined the mob on the East Front steps because he believed Pennsylvania congressman Dough Mastriano was giving a speech at this location. Trial Transcript at 29, 65, United States v. Nester, No. 22-00183.

Nester testified that when he saw a "scuffle happening" at the first barricade, he thought it was just people who were very anxious to see Mastriano speak. *Id.* at 31. When other rioters removed bike racks from the police, Nester testified that he believed it was just "some eager individuals [who] were helping" to clear the way for Mastriano's speech. *Id.*

Nester testified that when he got to the top of the steps, he realized Mastriano was not there, and he joined the mob that "filled the area outside the rotunda doors" for approximately 40 minutes. Nester saw police officers standing in front of the door who were "keeping people from gaining access to the door." *Id.* at 34. He saw rioters in the crowd engaging in violence towards the police officers. *Id.*

According to Nester, he knew that the police didn't want the mob to enter the building; however, when the doors opened, Nester testified that he believed he had a right to enter because "[the police] were no longer there, so they weren't blocking the entrance" and because the "Capitol grounds were generally open to the public." *Id.* at 35-36; *see also* 75. Due to the chaotic scene, he described his actual entrance into the building as a "crush" that was "terrifying." *Id.* at 39.

On cross examination, Nester admitted that when he entered, he was part of a "chaotic, disorganized mob"; people were yelling and pushing; there was an alarm ringing; there was broken glass in the door; there were police in riot gear; there was teargas in the air; and people around him

were sprayed by tear gas. *Id.* at 72-73, 85. According to Nester, he was "close enough to see those police physically exhausted trying to keep the crowd back with every means they had." *Id.* at 77. He saw "violence against the police" and people "attempting to strike the police." *Id.* at 74-75.

Notwithstanding this, Nester insisted that once the door opened "there was nothing restricting [him] from entering, so [he] thought [he] had permission to enter." *Id.* at 75. According to Nester, he believed at the time that not only he, but the "the thousands of people assembled in a disorderly mob[,] had permission … to storm into the Capitol building." *Id.* at 79.

When asked about his communications with Ester Doll after the riot, Nester explained that when he said he had been prepared to "go down" at the Capitol, he meant he had been "ready to die for [his] cause." *Id.* at 90. According to Nester, he had expected the police to shoot into the crowd to prevent rioters from entering the building. *Id.* Nonetheless, he entered the building because "[t]he election matters were … of utmost importance to me in this nation, [and] I would go down to see that the election is fixed." *Id.*

### The Charges and Convictions

On May 25, 2022, the United States charged Nester and two co-defendants by a 4-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On March 7, 2024, a jury convicted Nester of all counts. Nester now faces sentencing for these offences.

### III.   The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

11

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

**Count 1: 18 U.S.C. § 1752(a)(1)**

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Obstruction of Justice (U.S.S.G. §3C1.1) | +2 |
| Total Adjusted Offense Level | 8 |

**Count 2: 18 U.S.C. § 1752(a)(2)**

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Obstruction of Justice (U.S.S.G. §3C1.1) | +2 |
| Total Adjusted Offense Level | 12 |

*See* PSR at ¶¶ 47-55.

The U.S. Probation Office calculated Nester's criminal history as category I. PSR at ¶58. Accordingly, the U.S. Probation Office calculated Nester's total adjusted offense level as 12, and his corresponding Guidelines imprisonment range at 10-16 months' imprisonment. PSR at ¶ 102.

*Obstruction of Justice*

The 2-level upward adjustment for obstruction of justice is appropriate because Nester attempted to obstruct and impede his prosecution by testifying falsely about a material fact at trial. U.S.S.G. §3C1.1. provides for a two-level increase of a defendant's offense level if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction. In an effort evade accountability, Nester testified falsely under oath about a key element the Government was required to prove at trial. Specifically, he falsely denied knowing the Capitol

building was restricted on January 6 and claimed that, at that time, he believed he was permitted to enter.

This denial was an implausible and transparent effort to escape conviction that was rejected by the jury.  First, Nester testified that he believed he was permitted to enter the East Plaza and go up the stairs—notwithstanding seeing police officers and barricades blocking his way and rioters fighting with the police—because he believed Pennsylvania congressman Dough Mastriano was giving a speech there. There is no evidence that Mastriano was near this location, and none of Nester's communications or video of him and his group mentioned Mastriano while they were at this location. Nester's claim at trial that he believed Mastriano was going to give a speech in the middle of what had become a violent riot was an obvious effort to falsely deny he knew the area was restricted.

Moreover, Nester's self-serving testimony that he believed he was allowed to enter the Capitol building when rioters forced open the door was also false. Nester testified that he stood outside the Rotunda Door for 40 minutes, during which time he knew the police were attempting to keep the mob out and during which time rioters were shouting, "let us in!" and attacking the police. He saw broken glass and people sprayed with tear gas. He told a friend that that the police only "relented when they were defeated" and described his experience entering the building in a mob as a "crush" that was "terrifying." Despite these facts, he testified at trial that he believed he "had permission to enter" after the door was forced open and because the police were out of the way and the Capitol was generally open to the public. This testimony was a clearly disingenuous effort to negate the mens rea required for the crime.

This false testimony was rendered all the more absurd by his insistence on cross-examination that he believed that not only he, but the thousands of other rioters storming the

Capitol had permission to enter. The jury clearly rejected this self-serving testimony, which warrants an upward adjustment for obstruction of justice.

*U.S.S.G. § 4C1.1*

Significantly, U.S.S.G. § 4C1.1 does not apply in this case because Nester used credible threats of violence and purchased dangerous weapons in connection with his crimes at the Capitol. *See* U.S.S.G. § 4C1.1(a)(3), (7).

The totality of the circumstances makes clear that Nester used credible threats of violence when he joined a mob that surrounded officers outside the Rotunda Door, demanding to be let in. During the sentencing of Pauline Bauer—one of the other individuals that Nester drove to Washington D.C. on January 6—Judge McFadden defined the credible threat of force as "a believable expression of an intention to use physical force to inflict harm." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6. And threatening conduct, like Nester's, is best understood in the context in which it took place. As Judge Howell found, "In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction." *United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

Nester was part of a violent mob that overwhelmed the police at the Rotunda Door. He

14

refused to leave even after seeing other rioters assault the police and hearing the hostile shouts and demands to be let it. He and his group crowded ever closer, surrounding the remaining officers at the door, as they were attacked with tear gas, flag poles, and projectiles, until—in Nester's own words—"they relented when they were defeated." Nester's own actions were part of the credible threat of violence against officers he knew were "badly outnumbered and overpowered." The video evidence and the testimony of Officers Carrion and Warner confirm this. Both officers testified that the actions of the rioters at the door, who like Nester were trying to get inside, created a dangerous situation for the police and that they were physically attacked.

Moreover, Nester's own testimony confirms the extreme mindset he had that day. He testified that he was ready to die for his cause. He later told another rioter that he had expected the police to start shooting to protect the door and talked of a "mountain of bodies." Yet he did not retreat. He moved ever closer to the overwhelmed police, through his actions contributing to the threat of violence against them if they did not allow rioters through the door.

Additionally, U.S.S.G. § 4C1.1 does not apply because Nester *purchased* dangerous weapons in connection with his conduct on January 6. U.S.S.G. § 4C1.1(a)(7). As described above, Nester spent several days researching firearms law in the District of Columbia prior to traveling to D.C. After he concluded that bringing a gun to D.C. was too risky because it could result in a felony charge, on January 4, he purchased other dangerous weapons to bring to D.C. Specifically, he told Sandra Weyer that he had purchased "another taser, 2 pepper sprays, and a 3-inch knife" as part of his planning to come to D.C.[5] Thus, the evidence shows that Nester purchased a dangerous weapon in connection with the offense, disqualifying him from the downward

---

[5] At trial, Nester confirmed that he purchased the weapons in anticipation of his possible participation in a riot in Washington D.C. on January 6. Trial Transcript at 104.

adjustment.

Moreover, due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history. [6]

*U.S.S.G. § 3B1.2*

The Government agrees with the Probation Officer that Nester does not qualify for a downward adjustment for being a minor participant in the offense pursuant to U.S.S.G. § 3B1.2. PSR ⁋ 50. § 3B1.2 applies only to a defendant who is "substantially less culpable than the average participant in the criminal activity." Application Note 3(A). "The determination whether to apply [§3B1.2] is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the case." Application Note 3(C)). The defendant bears the burden of proving by a preponderance of the evidence that he is entitled to a mitigating role adjustment. *See United States v. Carpenter*, 252 F.3d 230, 234 (2d Cir. 2001). Here, in light of all relevant conduct, Nester was not a minor or minimal participant. First, each member of the mob contributed to the overwhelming numbers that overpowered the police and shut Congress down. Additionally, Nester drove eight other people to Washington D.C. on January 6, five of whom were convicted for their

---

[6] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

participation in the riot. He planned in advance what weapons they could bring. He personally overran three police lines, surrounded the police at the Rotunda Door, and entered the Capitol itself – something that many other rioters did not do. His conduct was more aggravated than average, and accordingly he is not eligible for a downward departure pursuant to USSG §3B1.2.

*U.S.S.G. § 3E1.1*

The Government agrees with the Probation Department's conclusion that Nester does not qualify for a downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. PSR ⸿ 53. To be eligible for this downward adjustment, the defendant must clearly demonstrate acceptance of responsibility for his offense, which Nester fails to do. Significantly, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." § 3E1.1, Application Note 2. At trial Nester denied a key element of the offense – that he had the knowledge and intent to enter a restricted area. He (falsely) claimed that he believed he was permitted to enter the Capitol, notwithstanding overwhelming evidence that he was not. His earlier effort to plead guilty *nolo contendre* further reinforces his refusal to accept responsibility.  The very reason he requested this plea was to avoid admitting that he was really guilty. Moreover, in his recent letter to the Probation Officer, Nester reaffirmed that even now he continues to dispute that he had the mens rea element of the offense. *See* PSR ⸿ 36 ("I dispute some of the required elements."). Accordingly, Nester is not eligible for a downward departure based on acceptance of responsibility.

Finally, to avoid unnecessary litigation, if the court declines to apply §§ 4C1.1, § 3B1.2, and § 3E1.1 the government respectfully requests that the Court make clear at sentencing that it

would have imposed the same sentence regardless of whether these adjustments applied.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 12 months' incarceration, $500 in restitution, and a fine.

### A.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Nester's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Nester, the absence of violent or destructive acts is not a mitigating factor. Had Nester engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Nester's case is that he joined a violent mob that overran police defenses at three separate locations. While there is no evidence that he assaulted police, his conduct was threatening to them. He knew that the police were trying to keep the rioters out, and he joined the mob pushing up against the police defenses until they broke. He saw other rioters tearing the barricades away and assaulting the police. He then moved past the broken police lines with the mob into the restricted area and the Capitol building. His conduct of refusing police commands to leave, pushing forward, and surrounding the police officers at the door as part of a

loud and hostile mob constituted a real and credible threat to the officers who attempted to defend their positions and emboldened other rioters who assaulted police.

Nester knew that other rioters were assaulting the police. He testified at trial that he saw violence toward the police at the Rotunda Door. He also saw rioters ripping the metal barriers away from the police and attacking them on the East Plaza. Yet he joined this violent mob in overrunning the police lines.

Moreover, far from an incidental participant, the evidence supports a finding that Nester went to Washington D.C. with an intent to be a part of the violence. He described his group as "hardcore" and said they were "looking to get involved [in] scuffles." He purchased weapons to bring to D.C. and expressed surprise when the police acted with restrain in response to the assault. He expected the police to fire bullets at the rioters and was surprised they did not create a "mountain of bodies." None of this deterred him from storming the Capitol because he was "prepared to die" for his cause.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

**B.  Nester's History and Characteristics**

Nester is a 57-year-old man with little to no criminal history. Nester was involved in local politics. He organized a group of eight other rioters who came to Washington D.C. from Pennsylvania, many of whom have also been convicted of committing crimes on January 6.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United*

*States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Nester's threatening conduct, his extreme views about his role and lack of remorse support the need for specific deterrence. Specifically, Nester stated that he was "willing to die" for his

cause on January 6. He expected the police to shoot live rounds and was surprised when they did not.

Additionally, Nester has expressed little to no remorse. At trial, Nester attempted to justify his actions by claiming that he had entered the Capitol because it was "open to the public" and that even though he had seen rioters assaulting the police moments earlier he believed the police had let the rioters in. These explanations, which are contradictory to the evidence, suggest that Nester has not accepted responsibility for his actions and support a need for specific deterrence.

Nester also testified that after he went home to Pennsylvania, he thought the events at the Capitol were a "good thing" and only decided it was not a good thing after he saw video from that day and "became aware that the police were going to be interested in people who were there." Trial Transcript at 37. At trial, he maintained that he did not "regret going." Id. And in his recent letter to the Probation Officer, he continued to dispute that he was guilty of all elements of the offenses of which he was convicted.

With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 is real. The Court should sentence Nester in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH

Court must sentence Nester based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. These cases involve defendants who were convicted at trial and sentenced by this Court for the same four charges as Nester.

Perhaps the closest comparison is *U.S. v. Russell Dean Alford*, 21-CR-263-TSC. Alford entered the Capitol through the Upper House Door on the east side of the building, which had been broken open shortly before he entered, and at the time of his entry, a windowpane had been smashed and an alarm was sounding continuously. Similarly to Nester, Alford remained in the building for about 15 minutes. After the police began clearing people from his area, Alford initially did not leave, then eventually left with the crowd. Like Nester, Alford had a criminal history score of zero. Also like Nester, Alford falsely testified at trial and was subject to a 2-level sentencing adjustment for obstruction of justice. The Government requested a 12-month sentence, and the Court sentenced him to 12 months.

In *U.S. v. Stacey Wade Hager*, 21-CR-381-TSC, the defendant entered the Capitol through the Upper West Terrace Door, and then walked throughout various parts of the Capitol. Like Nester, Hager was in a position to observe the violence occurring on January 6, but nevertheless made his way deeper into the Capitol. And like Nester, Hager had a criminal history score of zero.

---

CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Unlike Nester, however, Hager did not testify at trial and thus was not subject to a two-level adjustment for obstruction. This distinction helps explain why Hager received a lower sentence than Alford. The Government requested 12 months' incarceration, and the Court sentenced Hager to seven months.

In *U.S. v. Anthony Vo*, 21-CR-509-TSC, the defendant entered the Capitol after having walked through rioters and having seen rioters climbing on scaffolding and the sides of the building. He spent 27 minutes inside, moving through the Rotunda and Statuary Hall and taking photographs with his mother. Like Nester, he subsequently bragged about storming the building. Unlike Nester, however, Vo did not testify at trial and was not subject to a two-level adjustment for obstruction of justice. The Government requested that Vo be sentenced to 11 months' incarceration, and the Court sentenced Vo to 9 months.[8]

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

---

[8] Additionally, the two individuals with whom Nester moved through the Capitol – Brian Korte and Sandra Weyer – have each been sentenced, though neither is the best comparison for Nester. Korte, who was a co-defendant of Nester, is not a good comparison because Korte pled guilty to only one misdemeanor count, 40 U.S.C. § 5104(e)(2)(G) (Parading, demonstrating, or picketing in a Capitol Building), before trial. Due to the early guilty plea, Korte's relevant conduct, some of which mirrored that of Nester, was not fully known to the Government. Additionally, unlike Nester, there were no relevant statements making clear Korte's knowledge and intent. The Government recommended a sentence of 30 days, and the Court sentenced Korte to 21 days. Sandra Weyer was charged separately with the same four misdemeanor offenses as Nester and Korte, as well as 18 U.S.C. § 1512 (Obstruction of congress). Chief Judge Boasberg sentenced Weyer to 14 months' incarceration for the § 1512 offense and 12 months' incarceration for the misdemeanor offenses, to run concurrently.

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Nester was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

   More specifically, the Court should require Nester to pay $500 in restitution for his convictions on all counts. This amount fairly reflects Nester's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI.   Fine

   The defendant's convictions subject him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). Whereas a defendant's representation by appointed counsel is "a significant indicator" of inability to pay a fine, § 5E1.2, comment. (n.3), Nester was represented by retained counsel.

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $5,500-$55,000. U.S.S.G. § 5E1.2(c).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 12 months' incarceration, restitution in the amount of $500, and a fine. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Nester's liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Brian Morgan*
BRIAN MORGAN
NY Bar No. 4276804
Trial Attorney
601 D Street, N.W.
Washington, D.C. 20530
Brian.morgan@usdoj.gov
(202) 305-3717

/s/ *Katherine E. Boyles*
Katherine E. Boyles
Assistant U.S. Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
Katherine.Boyles@usdoj.gov
(203) 931-5088